**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| PAULETTE CAUSEY, as Natural Guardian of CAMERON WOODARD, a Minor Child, and Surviving Child of DAVID WOODARD, deceased, | **)** **)** **)** **)** **)** | |
| Plaintiff, | **)** **)** | **CIVIL ACTION FILE NO:** |
| v. | **)** **)** | _____ |
| CORRECTHEALTH, LLC, CORRECTHEALTH HOUSTON, LLC, and LISA BARWICK, | **)** **)** **)** **)** | **JURY TRIAL DEMANDED** |
| | **)** **)** | |
| Defendants. | **)** **)** | |

**COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff Paulette Causey, as Natural Guardian of Cameron Woodard, a Minor Child and Surviving Child of David Woodard, and files this Complaint for Damages against Defendants CorrectHealth, LLC (hereinafter "CorrectHealth"), CorrectHealth Houston, LLC (hereinafter "CorrectHealth Houston"), and Lisa Barwick, and shows this Honorable Court as follows:

**PARTIES AND JURISDICTION**

1.

Paulette Causey is the natural guardian of Cameron Woodard, the surviving child of David Woodard. Paulette, and her son, are citizens and residents of Georgia. David Woodard did not have a spouse at the time of his death. As a result, his child, Cameron Woodard, has standing and is the proper party to seek damages for the full value of David Woodard's life pursuant to Georgia's wrongful death statute. *See* O.C.G.A. § 51-4-2.

-1-

2.

Defendant CorrectHealth is a Domestic Limited Liability Company organized and existing under the laws of the State of Georgia. Defendant CorrectHealth can be served with process on its registered agent, CT Corporation System, located at 597 Big A Road, Toccoa, Georgia 30577, or as otherwise allowed by law.

3.

Defendant CorrectHealth Houston is a Domestic Limited Liability Company organized and existing under the laws of the State of Georgia. Defendant CorrectHealth Houston can be served with process on its registered agent, The Corporation Company, located at 597 Big A Road, Toccoa, Georgia 30577, or as otherwise allowed by law.

4.

Houston County Detention Center is a correctional facility in Perry, Georgia, owned and operated by Houston County under the Houston County Sheriff's Office. Houston County Detention Center is legally responsible for providing medical care to inmates in its custody. Houston County Detention Center undertook to provide medical care to inmates in its custody by contracting with CorrectHealth and/or CorrectHealth Houston. At all relevant times to this action, CorrectHealth and/or CorrectHealth Houston provided healthcare to inmates in the custody of Houston County Detention Center. At all relevant times to this action, a medical provider-patient relationship existed between David Woodard, Houston County Detention Center, CorrectHealth, CorrectHealth Houston, and the individual agents or employees of each of those entities that were medical providers.

5.

Defendant Lisa Barwick is a citizen and resident of Georgia. At all relevant times, Defendant Barwick was a Licensed Practical Nurse licensed under the laws of the State of Georgia who was acting as an agent or employee of CorrectHealth and/or CorrectHealth Houston and was acting under the color of state law. Defendant Barwick may be served with Summons and Complaint at her residence, 1033 Fagen Mill Road, Warner Robins, Houston County, Georgia 31088, or as otherwise allowed by law.

6.

Federal subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 because some of Plaintiff's claims arise under federal law. In addition, this Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because the events giving rise to this claim occurred in this judicial district and division.

## FACTUAL ALLEGATIONS

7.

Plaintiff realleges and incorporates by reference the foregoing paragraphs as if they were restated verbatim herein.

8.

On October 1, 2024, police were dispatched to David Woodard's father's residence. Mr. Woodard's father told dispatch that he thought his son might have been huffing gas because he was running outside in the front yard naked and hallucinating.

9.

Officer Tripp checked in with dispatch about an ETA from EMS and was advised there were no units available.

10.

Because David Woodard was being transported to Houston County Sheriff's Office Detention Center where he would be checked out by medical staff, Officer Tripp decided to transport David to the detention center in the back of the patrol car and disregard EMS.

11.

While in the back seat of the patrol vehicle on the way to the Detention Center, David was making unintelligible statements, flailing his body back and forth, hollering, and putting his knees to his head.

12.

At Houston County Detention Center, intake personnel were advised that David Woodard was being combative with patrol. When he arrived at the facility, he was still being combative, so he was placed into cell J-15, a single cell with padded walls.

13.

Sergeant Cline called Nurse Barwick to J-15 to check David's vitals.

14.

Nurse Lisa Barwick documented that she arrived at intake to check on David and found him rolling around in his cell and fondling himself.

15.

Nurse Barwick described David's behavior as unpredictable. His eyes were opened wide and he was mumbling incomprehensible words.

-4-

16.

Nurse Barwick did not check David's vitals.

17.

Nurse Barwick did not do an intake screening on David.

18.

Nurse Barwick said she would return once he calmed down and left David in the cell.

19.

Nurse Barwick did not contact a senior medical provider for any questions about David or his condition.

20.

Nurse Barwick did not transfer David to a hospital emergency department.

21.

Nurse Barwick would not return to David Woodard's cell for approximately four hours.

22.

While David was in the cell, he exhibited clear signs of a serious medical need.

23.

While David was in his cell, he exhibited clear signs of altered mental status.

24.

While David was in his cell, he showed signs and symptoms consistent with a drug overdose.

25.

After Nurse Barwick left, nobody checked on, examined, or interacted with David for almost four hours.

26.

During that time, video footage from inside the cell shows David erratically moving around the cell and exhibiting signs and symptoms of an objectively serious medical need that was so obvious even a layperson would have recognized the need for medical treatment.

27.

Nurse Barwick and other agents and employees of CorrectHealth and CorrectHealth Houston had access to the camera feed from inside the cell.

28.

At one or more points between 8:22 a.m. and 12:29 p.m., Nurse Barwick checked the camera feed and observed David in his cell.

29.

At approximately 12:30 p.m., David was provided lunch and water. Because he continued moving around the cell the food ended up on the floor and the cup of water was knocked over.

30.

Video footage of the inside of cell J-15 shows David on the ground at 12:39 p.m.

31.

At 12:42 p.m., still on the ground, he moves his body towards the door. His head is against the door, facing up. He continues to move in place but not in the same manner as before.

32.

Sergeant Elizabeth Cline looks in the cell at approximately 12:50 p.m. and observes David as he lay at the door for several minutes.

33.

At approximately 12:55 p.m., Nurse Barwick was called to cell J-15. She got to the cell and asked, "What do we got?" She was told that David's lips looked white. Nurse Barwick could not get a good visual of David because his head was too close to the door so she opened the door to his cell. She checked his vitals and noted no breathing activity, dry food on his lips, and that he was staring into space with his eyes fixed.

34.

Nurse Barwick asked for an AED at approximately 1:03 p.m. and started CPR. 911 was called. Multiple no shock advisories were given during the CPR process. Narcan was given.

35.

At 1:04 p.m., nurses arrived with oxygen and a jump bag. At approximately 1:10 p.m., the nursing supervisor entered the cell.

36.

Nurse Mossbarger, an employee of CorrectHealth or CorrectHealth Houston, responded to J-15 to help Nurse Barwick.

37.

Nurse Mossbarger checked David's medical history to see if he had any issues with blood sugar but did not see any history of it. She saw that David did have a history of using drugs, according to their records.

38.

Houston County EMS arrived at approximately 1:13 p.m. and placed David on a stretcher with automatic chest compressions in place. They left Houston County Detention Center at 1:15 p.m.

39.

EMS listed the primary symptom as cardiac arrest with a secondary impression of "endocrine-diabetes with hypoglycemia."

40.

At 1:14 p.m., EMS noted a blood glucose level to be "low." The blood glucose level was 0 mg / dL at 1:15 p.m.

41.

EMS administered naloxone at approximately 1:15 p.m. without improvement.

42.

At 1:15 p.m. IV Dextrose 50% solution was administered and David's "response was improved." He was intubated at 1:17 p.m. and ROSC was obtained at 1:19 p.m.

43.

EMS arrived at the Houston Healthcare Warner Robins Emergency Department at approximately 1:45 p.m. A 16 FR Foley was put in place with no urine output obtained. David was hooked up to a 12-lead cardiac monitor and lifepak. Multiple wounds were noted. His initial vitals were: Temperature 98.4F, HR 102, BP 104/83, RR 32, and O2 SAT 100% on the ventilator, and a glucose of 133 mg/dL. His labs were notable for a CK of >7,800 U/L, POC potassium of 7.8 and a POC creatinine of 4.9, and an ECG with widened QRS and peaked T-waves.

44.

At approximately 2:26 p.m. David was receiving IV fluids when his eyes dilated and he went into cardiac arrest. ACLS protocol was started, and he was treated with epinephrine, calcium chloride, sodium bicarbonate. David briefly gained a faint pulse about 10 minutes into CPR for 15 seconds. He did not regain a pulse after that.

45.

David was pronounced deceased at 2:54 p.m.

46.

An autopsy was performed by the GBI, Division of Forensic Sciences, Office of the Medical Examiner, on October 4, 2024. The cause of death was determined to be "toxic effects of methamphetamine." A toxicology report found that David was positive for methamphetamine 3.8 mg/L.

47.

Despite David Woodard's condition and clear signs of drug overdose, CorrectHealth and/or CorrectHealth Houston staff, including Defendant Lisa Barwick failed to perform proper assessments, failed to contact senior medical providers for assistance, failed to provide appropriate medical care for drug overdose, and failed to timely transfer David to a hospital emergency department.

48.

David Woodard's death was a direct and proximate result of the inadequate and improper medical care he received for his drug overdose while at Houston County Detention Center which resulted in critical hypoglycemia, cardiac arrest, and death.

## COUNT I: STATE LAW PROFESSIONAL NEGLIGENCE CLAIMS AGAINST DEFENDANTS CORRECTHEALTH, CORRECTHEALTH HOUSTON, AND LISA BARWICK

49.

Plaintiff realleges and incorporates by reference the foregoing paragraphs as if they were fully restated verbatim herein.

50.

At all relevant times, Defendant Lisa Barwick and other unidentified medical providers who interacted with or observed David Woodard on October 1, 2024, were acting as agents or employees of CorrectHealth and/or CorrectHealth Houston.

51.

The individual medical providers working for CorrectHealth and/or CorrectHealth Houston who interacted with, observed, or made any medical decisions regarding David Woodard, including but not limited to Defendants Lisa Barwick and other medical providers from CorrectHealth and/or CorrectHealth Houston, had a duty to exercise ordinary care, skill, and diligence in evaluating, diagnosing, and treating David Woodard in a manner that was in accordance with the applicable professional standard of care of patients under the same or similar circumstances and conditions as David Woodard.

52.

Defendants CorrectHealth and/or CorrectHealth Houston, and their agents or employees, including but not limited to Defendants Lisa Barwick and other unidentified medical providers, breached their duty to exercise ordinary care, skill, and diligence in evaluating, diagnosing, and treating David Woodard in at least the following ways:

a) David Woodard was experiencing signs and symptoms of a serious medical condition when he arrived at the jail and was placed in the cell. This included a potential drug overdose. Despite these signs and symptoms of a serious medical condition, the nursing staff at the jail, including Lisa Barwick, failed to check David's vitals or send him out to a hospital for further evaluation and management of his condition. Instead, David was left in cell J-15, untreated and unexamined, for over four hours. The failure to

medically evaluate David Woodard properly for over four hours and the failure to send him to the emergency room constitutes a deviation from the standard of care. Lisa Barwick's care, and that of the other medical providers at Houston County Detention Center, showed a deliberate indifference to David Woodard's serious medical condition.

b) Defendant Lisa Barwick and other medical staff at Houston County Detention Center fell below the standard of care by not contacting a RN, physician, or senior medical provider when they encountered issues during the intake process. If they were unable to obtain vitals, the standard of care required that they contact a senior medical provider for assistance.

c) The failure to assess David Woodard's vitals, and the failure to escalate his condition to a RN, physician, or other senior medical provider, or to send David to the hospital, represents deliberate indifference to David Woodard's serious medical needs.

53.

Defendants CorrectHealth and/or CorrectHealth Houston, and Lisa Barwick are being sued for state law negligence claims that include allegations of professional negligence. Even though O.C.G.A. § 9-11-9.1 does not apply in federal court, Plaintiff has attached hereto as Exhibits 1 and 2, and incorporated by reference, the affidavits of Terry Fillman, R.N., C.C.H.P., and Jonathan de Olano, M.D., M.A.T. who are qualified as expert witnesses on the issues raised in the Complaint. Nurse Fillman and Dr. de Olano's affidavits specify at least one negligent act or omission on the part of the agents and employees of CorrectHealth and/or CorrectHealth Houston, and the factual basis that underlies the negligent act or omission.

-11-

54.

Defendants CorrectHealth and CorrectHealth Houston are liable for the negligent acts and omissions of their agents and employees under the doctrine of respondeat superior.

55.

As a direct and proximate result of the professional negligence of Defendants CorrectHealth and/or CorrectHealth Houston, and their agents and employees, David Woodard died. As a result, Plaintiff Cameron Woodard, as the surviving child of David Woodard, is entitled to damages for the full value of the life of David Woodard.

**COUNT II: CLAIM UNDER 42 U.S.C. § 1983 AGAINST DEFENDANT LISA BARWICK, IN HER INDIVIDUAL CAPACITY, FOR FAILURE TO PROVIDE MEDICAL TREATMENT TO DAVID WOODARD IN VIOLATION OF THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION**

56.

Plaintiff realleges and incorporates by reference the foregoing paragraphs as if they were fully restated verbatim herein.

57.

At all times relevant to this action, Defendant Lisa Barwick was acting under the color of state law.

58.

When David Woodard was at Houston County Detention Center, he had serious medical needs that, if left unattended, posed a substantial risk of serious harm.

59.

David Woodard's serious medical needs during his interactions with Defendant Lisa Barwick were so obvious that a layperson would have easily recognized the need for medical

treatment and a doctor's attention. Furthermore, a delay in treating David Woodard's medical conditions worsened his condition and ultimately resulted in his death.

60.

Defendant Lisa Barwick was deliberately indifferent to David Woodard's serious medical needs while he was at Houston County Detention Center, in violation of David Woodard's clearly established rights under the Fourteenth Amendment to the United States Constitution, in failing to provide any medical care and treatment to David Woodard despite these obvious serious medical needs.

61.

Defendants Lisa Barwick knew that David Woodard had a serious medical need, and a reasonable layperson witnessing David Woodard on October 1, 2024, would recognize that a doctor's attention was necessary to address whatever health problem he might be experiencing.

62.

While knowledge of the specific medical condition is not required to establish a claim, David Woodard's history and signs and symptoms would have led a reasonable layperson to conclude that he was experiencing a drug overdose and needed immediate medical attention. Defendants Lisa Barwick knew that David was acting erratically and unpredictably. She knew he was mumbling incomprehensibly. She knew he had a documented history of drug use. In short, she knew that David Woodard had signs and symptoms of a serious medical condition related to drug overdose.

63.

Additionally, the acts and omissions of Defendant Lisa Barwick were objectively unreasonable.

64.

As a direct and proximate result of Defendant Lisa Barwick's deliberate indifference to David Woodard's serious medical needs and objectively unreasonable conduct, David Woodard's 14th Amendment Rights under the United States Constitution were violated and he ultimately died. As a result, Plaintiff is entitled to special and general damages.

## COUNT III: ATTORNEY'S FEES UNDER O.C.G.A. § 13-6-11 AGAINST ALL DEFENDANTS

65.

Plaintiff realleges and incorporates by reference the foregoing paragraphs as if they were restated verbatim herein.

66.

Defendants' acts and omissions as described in this Complaint constitute bad faith in the underlying transaction. As a result, pursuant to O.C.G.A. § 13-6-11, Plaintiff is entitled to an award of attorney's fees and expenses of litigation.

## COUNT IV: CLAIM FOR ATTORNEY'S FEES AND EXPENSES OF LITIGATION UNDER 42 U.S.C. § 1988 AGAINST DEFENDANT LISA BARWICK

67.

Plaintiff realleges and incorporates by reference the foregoing paragraphs as if they were restated verbatim herein.

68.

Plaintiff is entitled to attorney's fees and expenses of litigation from Defendant Lisa Barwick pursuant to 42 U.S.C. § 1988.

## COUNT V: NEGLIGENT TRAINING AND SUPERVISION AGAINST DEFENDANTS CORRECTHEALTH AND CORRECTHEALTH HOUSTON

69.

Plaintiff realleges and incorporates by reference the foregoing paragraphs as if they were restated verbatim herein.

70.

Defendants CorrectHealth and CorrectHealth Houston had a duty to exercise ordinary care in training and supervising their employees, including Defendant Barwick.

71.

Defendants CorrectHealth and CorrectHealth Houston breached their duty to exercise ordinary care in training and supervising their employees in at least the following ways:

a) In failing to create and implement proper rules, policies, and procedures for the intake of inmates who may be experiencing medical emergencies, drug overdoses, or whose vital signs cannot be obtained;

b) In failing to properly train their employees on how to identify signs and symptoms of a drug overdose;

c) In failing to properly train their employees on when to send inmates to the hospital;

d) In failing to create, implement, and train employees on proper rules, policies, and procedures for handling inmates who may be experiencing a drug overdose;

e) In failing to properly supervise Defendant Barwick, Adams, and Mossbarger in the performance of their job responsibilities and provision of medical services to inmates at the Houston County Detention Center; and,

f) In committing such other negligent acts and omissions as may be shown by the evidence and proven at trial.

72.

As a direct and proximate result of Defendants CorrectHealth's and CorrectHealth Houston's failure to exercise ordinary care in training and supervising its employees, David Woodard died.  As a result, Plaintiff is entitled to special and general damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays and demands as follows:

1) That Process and Summons issue, as provided by law, requiring Defendants to appear and answer Plaintiff's Complaint;

2) That service be had upon Defendants as provided by law;

3) That the Court award and enter a judgment in favor of Plaintiff and against Defendants for special and general damages in an amount to be proven at trial for Plaintiff's state law claims;

4) That the Court award and enter a judgment in favor of Plaintiff and against Defendant Lisa Barwick for Plaintiff's claims under 42 U.S.C. § 1983 for violation of David Woodard's constitutional rights under the 14th Amendment;

5) That the Court award and enter a judgment in favor of Plaintiff and against Defendants for attorney's fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11;

6) That the Court award and enter a judgment in favor of Plaintiff and against Defendant Lisa Barwick for attorney's fees and expenses of litigation pursuant to 42 U.S.C. § 1988;

7) That Plaintiff have a trial by jury as to all issues; and

8) That Plaintiff have such other and further relief as the Court may deem just and proper.

-17-

Respectfully submitted this 29th day of April, 2026.

THE CHAMPION FIRM, PERSONAL
INJURY ATTORNEYS, P.C.

By: _____
DARL H. CHAMPION, JR.
Georgia Bar No.: 910007
DEVON G. ZAWKO
Georgia Bar No. 212490

445 Franklin Gateway, SE
Suite 100
Marietta, GA 30067-7705
P:  (404) 596-8044
F:  (404) 671-9347
champ@thechampionfirm.com
devon@thechampionfirm.com

# EXHIBIT 1

State of California
County of San Bernardino

## AFFIDAVIT OF TERRY FILLMAN

Personally appeared before me, the undersigned officer duly authorized to administer oaths, Terry Fillman, who after being duly sworn, deposes as follows:

### 1.

I am Terry Fillman, RN, CCHP, a competent adult over the age of eighteen suffering under no disabilities and am otherwise competent to give this Affidavit. I am a Registered Nurse licensed since 1990 and have worked as a Correctional Registered Nurse from 1991 to 2023. I have been a Certified Correctional Healthcare Professional (CCHP) since 1995.

### 2.

I most recently served as the Correctional Healthcare Administrator for Riverside County from April 2020 to July 2023, where I managed correctional healthcare operations at 8 separate adult and juvenile correctional facilities that are accredited by the National Commission on Correctional Health Care. Prior to that, from 2011 to 2020, I managed daily operations and staff for medical and dental patient services at San Bernardino County Sheriff's Department with an average daily population of 6,000 inmates and 85,000 bookings annually. I also managed correctional mental health services operations and staff from 2017 to 2020.

### 3.

I have extensive experience in correctional healthcare spanning over 32 years. Throughout my career from 1991 to 2023, I provided both direct and indirect patient care for correctional patients. I am a member and educator for the National Commission on Correctional Health Care (NCCHC), American Correctional Health Services Association (ACHSA), American Correctional Association (ACA), and American Jail Association (AJA). I have served as a Health Administrator Corrections Inspector for the Institute of Medical Quality (IMQ) for California Title 15 jail surveys and IMQ accreditation inspection and surveys. I have researched, written, educated, and implemented Policies and Procedures consistent with NCCHC standards as well as Standardized Procedures for Registered Nurses with annual review and revision. Additionally, I have worked as a consultant and educator for the development of correctional health services administration, healthcare standards, policies and procedures, and staff training with on-site implementation. I was also a Board of State and Community Corrections Executive Steering Committee Member for review and revision of California Title 15 regarding jail standards in California 2016/2017.

**4.**

A full and complete description of my education and experience is contained in my CV, which is attached as Exhibit A and is incorporated herein by reference.

**5.**

I make this Affidavit for any lawful purpose. In particular, I have been asked to review medical and inmate records for David Michael Woodard from his detention at

Case 5:26-cv-00162-CAR   Document 1   Filed 04/29/26   Page 21 of 42

Houston County Detention Center in Georgia to determine whether any medical providers violated the standard of care during his incarceration there in October 2024.

**6.**

My knowledge, skill, experience, training, and education qualify me as an expert regarding the issues and opinions addressed in this Affidavit. I am also qualified to give opinions regarding the acceptable standard of care and conduct expected of the professionals whose conduct is at issue in this Affidavit, including the medical providers identified in the records as LPNs (licensed practical nurses).

**7.**

For at least three of the last five years preceding this Affidavit and the acts and omissions addressed in this Affidavit, I have actively practiced in my area of specialty with sufficient frequency to establish an appropriate level of knowledge in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the professionals whose conduct is at issue in this affidavit. In at least three of the five years prior to October 2024, my practice regularly included the evaluation, diagnosis, and management of patients in the correctional setting, as well as supervision of other providers—including LPNs—caring for those patients. Based on my knowledge, training, education, and experience, I am familiar with the standard of care that applied to the medical professionals who saw David Woodard on October 1, 2024, in the Houston County Detention Center.

**8.**

In rendering these opinions, I have reviewed the following materials:

- Medical Records for CorrectHealth from the Houston County Detention Center

- Medical Records from Emory Hospital Warner Robins

- David Woodard's Death Certificate

- GBI Autopsy Report

- Houston County Sheriff Incident Report

- Houston County Sheriff Investigative Report

- GBI Postmortem Blood Alcohol

- GBI Postmortem Toxicology

- CAD Reports

- Body and Dash Cam Videos

- Jail Cell and Intake Videos

- GBI Interview Transcripts

## 9.

The facts and opinions expressed in this Affidavit are based on the records I have reviewed, including the medical records created and maintained by the healthcare providers of David Woodard in the previously referenced medical records, which contain entries made by the individual healthcare providers. I have applied my training, education, and experience to the facts of this case, and the facts I base my opinions on are of the type reasonably relied upon by experts in my field.

## 10.

I reserve the right to amend the opinions contained in this Affidavit, or to express additional opinions, as additional information from witnesses, documents, and other evidence is provided to me in the course of this case.

## 11.

All opinions expressed herein rise to a quality of more likely than not and are made to a reasonable degree of medical certainty.

### FACTS

## 12.

Based on my review of the documents, I have obtained the following information:

a)      On October 1, 2024, police were dispatched to David Woodard's father's residence. David's father told dispatch that he thought his son was huffing gas because he was running outside in the front yard naked and hallucinating.

b)      Officer Tripp checked in with dispatch about an ETA from EMS and was advised there were no units available. Because David was being transported to Houston County Sherrif's Office Detention Center where he would be checked out by medical staff, Officer Tripp decided to transport David to the detention center in the back of the patrol car and disregard EMS. In the back seat of the patrol vehicle David was making unintelligible statements, flailing his body back and forth, contentiously hollering, and putting his knees to his head.

c)	At Houston County Detention Center intake personnel were advised that David was being combative with patrol. When he arrived at the facility, he was still being combative, so he was placed into cell J-15, a single cell with padded walls.

d)	Sargeant Cline called Nurse Barwick to J-15 to check David's vitals. At approximately 8:45 a.m. Nurse Lisa Barwick documented that she arrived at intake to check on David and found him rolling around on his cell and fondling himself. Nurse Barwick described David's behavior as unpredictable. His eyes were opened wide and he was mumbling incomprehensible words. Nurse Barwick did not check him and said she would return once he calmed down.

e)	Video footage of the inside of cell J-15 does not show anyone checking on, examining, or interacting with David between 8:20 a.m. and 12:30 p.m. During that time, video footage from inside the cell shows David erratically moving around the cell.

f)	At approximately 12:30 p.m., David was given lunch and water. Because he continued moving the food ended up on the floor and the cup of water was knocked over.

g)	Video footage of the inside of cell J-15 shows David on the ground at 12:39 p.m. At 12:42 p.m., still on the ground, he moves his body towards the door. His head is against the door, facing up. He continues to move in place but not in the same manner as before. Someone looks in the cell at approximately 12:50 p.m. and observes David as he lay at the door for several minutes.

h)	At approximately 12:55 p.m., Nurse Barwick was called to cell J-15. She got to the cell and asked, "What do we got?" She was told that David's lips looked white. Nurse Barwick couldn't get a good visual of David because his head was too close to the

door so she opened the door to his cell. She checked his vitals and noted a weak heart rate, no noted breathing activity, dry food on his lips, and that he was staring into space with his eyes fixed.

i) Nurse Barwick asked for an AED at approximately 1:03 p.m. and started CPR. 911 was called. Multiple no shock advisories were given during the CPR process. Narcan was given. At 1:04 p.m., nurses arrived with oxygen and a jump bag. At approximately 1:10 p.m., the nursing supervisor entered the cell.

j) Nurse Mossbarger responded to J-15 to help Nurse Barwick. She checked David's medical history to see if he had any issues with blood sugar but did not see any history of it. She saw that David did have a history of using drugs, according to their records.

k) Houston County EMS arrived at approximately 1:13 p.m. and placed David on a stretcher with automatic chest compressions in place. They left Houston County Detention Center at 1:15 p.m.

l) EMS listed the primary symptom as cardiac arrest with a secondary impression of endocrine-diabetes with hypoglycemia. EMS administered Narcan at approximately 1:15 p.m. without improvement. EMS noted a blood glucose level of 0 at 1:15 p.m. and administered Dextrose 50% solution 1 gram intravenous. David's condition improved. EMS obtained ROSC for 20 consecutive minutes. EMS differential diagnosis included substance induced psychosis, hypoglycemia, metabolic syndrome, and brain bleed.

m)      EMS arrived at the Houston Healthcare Warner Robbins Emergency Department at approximately 1:45 p.m. He was intubated by EMS and then placed on a ventilator. Arterial blood gas and labs were obtained. A 20-gauge IV catheter was placed in the right antecubital vein. A 16 FR Foley was put in place with no urine output obtained. David was hooked up to a 12-lead cardiac monitor and lifepak. Multiple wounds were noted. David's blood gas was 133. His initial vitals were HR 102, BP 104/83, RR 16, and O2 SAT 100%.

n)      At approximately 2:26 p.m. David was receiving IV fluids when his eyes dilated and he went into cardiac arrest. ACLS protocol started and David briefly gained a faint pulse about 10 minutes into CPR for 15 seconds. He did not regain a pulse after that. He was pronounced deceased at 2:54 p.m.

o)      An autopsy was performed by the GBI, Division of Forensic Sciences, Office of the Medical Examiner, on October 4, 2024. The cause of death was determined to be toxic effects of methamphetamine. A toxicology report found that David was positive for methamphetamine 3.8 mg/L.

## OPINIONS

### 13.

It is my opinion that the medical care that the medical professionals at the Houston County Detention Center provided to David Woodard at their facility on October 1, 2024, fell below the standard of care and treatment required of nurses under the same or similar circumstances.

### 14.

In particular, the care provided to David Woodard fell below the standard of care in at least the following respects:

(a) David was experiencing signs and symptoms of a serious medical condition when he arrived at the jail and was placed in the cell. This included a potential drug overdose. Despite these signs and symptoms of a serious medical condition, the nursing staff at the jail, including Nurse Barwick, failed to check David's vitals or send him out to a hospital for further evaluation and management of his condition. Instead, David was left in cell J-15, untreated and unexamined, for over four hours. The failure to medically evaluate David properly for over four hours and the failure to send him to the emergency room constitutes a deviation from the standard of care. Nurse Barwick's care, and that of the other medical providers at Houston County Detention Center, showed a deliberate indifference to David's serious medical condition.

(b) Nurse Barwick and other medical staff at Houston County Detention Center fell below the standard of care by not contacting a physician, RN, or senior medical provider when they encountered issues during the intake process. If Nurse Barwick was unable to obtain vitals, the standard of care required that she contact a senior medical provider for assistance.

(c) The failure to assess David's vitals, and the failure to escalate his condition to a physician or to the hospital represents deliberate indifference to David's serious medical needs.

15.

Had these violations of the applicable standard of care not occurred, David Woodard would have received proper medical intervention and his drug overdose could have been properly evaluated, diagnosed, and treated.

## 16.

The opinions expressed in this Affidavit are my opinions at this time and are based on the information I have been given. I reserve the right to change or modify my opinions, or to develop additional opinions, if further information is received during the case.

**FURTHER AFFIANT SAYETH NOT**

Terry Fillman, RN, CCHP

Sworn to and subscribed before me this 25th day of February, 2026

Notary Public Amber Hilfer
My Commission Expires: May 10, 2028

AMBER HILFER
Notary Public - California
San Bernardino County
Commission # 2489745
My Comm. Expires May 10, 2028

# EXHIBIT 2

State of Georgia
County of _Fulton_

# AFFIDAVIT OF JONATHAN DE OLANO, M.D., M.A.T.

Personally appeared before me, the undersigned officer duly authorized to administer oaths, Jonathan De Olano, M.D., M.A.T., who after being duly sworn, deposes as follows:

1.

I am Jonathan De Olano, M.D., M.A.T., a competent adult over the age of eighteen suffering under no disabilities and am otherwise competent to give this Affidavit.

2.

I'm an assistant professor of emergency medicine and medical toxicology at Emory University School of Medicine in Atlanta, GA. My current clinical roles include serving as an emergency medicine attending physician at Grady Hospital and the VA Hospital in Atlanta, as well as a medical toxicologist at the Georgia Poison Center. I am dual board-certified by the American Board of Emergency Medicine (ABEM) in both emergency medicine and medical toxicology. With extensive clinical experience, academic contributions, and dual board certifications, I am well-positioned to provide expert consultation and testimony in legal cases requiring specialized medical knowledge.

3.

I obtained my Bachelors in Arts at Georgetown University, followed by a Masters in Arts of teaching at American University in Washington, DC. I earned my Doctor of Medicine degree from Emory University School of Medicine and subsequently completed my residency in emergency medicine at the Ronald O. Perelman Department of Emergency Medicine at New York University School of Medicine. I have had a medical license since 2015. Following residency, I pursued a fellowship in medical toxicology at the NYU and the NY Poison Center.

4.

As a medical toxicologist, I have specialized expertise in drug overdoses, toxic exposures, and the complex pharmacokinetics of various substances. My work involves managing acute poisoning cases, evaluating drug interactions, and providing guidance on the clinical implications of toxicological findings. I have contributed to research and teaching on antidotal therapies, enhanced elimination techniques, and toxicokinetic modeling. I have also played a role in guideline development for toxicological emergencies at my institutions.

5.

Additionally, I have been actively involved in medical education, teaching emergency medicine residents, medical students, physician assistant students, and toxicology fellows about the pharmacodynamics and toxicological effects of various

drugs, including opioids, anticoagulants, sedatives, environmental exposures and other commonly litigated substances. I have organized and spoken at multiple international conferences in medical toxicology.

6.

A full and complete description of my education and experience is contained in my CV, attached as Exhibit "A", and incorporated herein by reference.

7.

I make this Affidavit for any lawful purpose. In particular, I have been asked to review medical and inmate records for David Michael Woodard from his detention at Houston County Detention Center in Georgia to determine whether any medical providers violated the standard of care during his incarceration there in October 2024.

8.

My knowledge, skill, experience, training, and education qualify me as an expert regarding the issues and opinions addressed in this Affidavit. I am also qualified to give opinions regarding the acceptable standard of care and conduct expected of the professionals whose conduct is at issue in this Affidavit, including the medical providers identified in the records as LPNs (licensed practical nurses).

9.

For at least three of the last five years preceding this Affidavit and the acts and omissions addressed in this Affidavit, I have actively practiced in my area of specialty with sufficient frequency to establish an appropriate level of knowledge in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the professionals whose conduct is at issue in this affidavit. In at least three of the five years prior to the care at issue, my practice regularly included the evaluation, diagnosis, and management of patients with signs and symptoms of drug overdose, as well as supervision of other providers—including LPNs—caring for those patients. Based on my knowledge, training, education, and experience, I am familiar with the standard of care that applied to the medical professionals who saw David Woodard on October 1, 2024, in the Houston County Detention Center.

10.

In rendering these opinions, I have reviewed the following materials:

- Medical Records for CorrectHealth from the Houston County Detention Center

- Medical Records from Emory Hospital Warner Robins

- David Woodard's Death Certificate

- GBI Autopsy Report

- Houston County Sheriff Incident Report

- Houston County Sheriff Investigative Report

- GBI Postmortem Blood Alcohol

- GBI Postmortem Toxicology

- CAD Reports

- Body and Dash Cam Videos

- Jail Cell and Intake Videos

- GBI Interview Transcripts

11.

The facts and opinions expressed in this Affidavit are based on the records I have reviewed, including the medical records created and maintained by the healthcare providers of David Woodard in the previously referenced medical records, which contain entries made by the individual healthcare providers. I have applied my training, education, and experience to the facts of this case, and the facts I base my opinions on are of the type reasonably relied upon by experts in my field.

12.

I reserve the right to amend the opinions contained in this Affidavit, or to express additional opinions, as additional information from witnesses, documents, and other evidence is provided to me in the course of this case.

13.

All opinions expressed herein rise to a quality of more likely than not and are made to a reasonable degree of medical certainty.

**FACTS**

14.

Based on my review of the documents, I have obtained the following information:

a)    On October 1, 2024, police were dispatched to David Woodard's father's residence. Mr. Woodard's father told dispatch that he thought his son was huffing gas because he was running outside in the front yard naked and hallucinating.

b)    Officer Tripp checked in with dispatch about an ETA from EMS and was advised there were no units available. Because Mr. Woodard was being transported to Houston County Sherrif's Office Detention Center where he would be checked out by medical staff, Officer Tripp decided to transport Mr. Woodard to the detention center in the back of the patrol car and disregard EMS. In the back seat of the patrol vehicle Mr. Woodard was making unintelligible statements, flailing his body back and forth, contentiously hollering, and putting his knees to his head.

c)    At Houston County Detention Center intake personnel were advised that Mr. Woodard was being combative with patrol. When he arrived at the facility,

he was still being combative, so he was placed into cell J-15, a single cell with padded walls.

d)    Sargeant Cline called Nurse Barwick to J-15 to check Mr. Woodard's vitals. At approximately 8:45 a.m. Nurse Lisa Barwick documented that she arrived at intake to check on Mr. Woodard and found him rolling around on his cell and fondling himself. Nurse Barwick described Mr. Woodard's behavior as unpredictable. His eyes were opened wide and he was mumbling incomprehensible words. Nurse Barwick did not check him and said she would return once he calmed down.

e)    Video footage of the inside of cell J-15 does not show anyone checking on, examining, or interacting with Mr. Woodard between 8:20 a.m. and 12:30 p.m. During that time, video footage from inside the cell shows Mr. Woodard erratically moving around the cell.

f)    At approximately 12:30 p.m., Mr. Woodard was given lunch and water. Because he continued moving the food ended up on the floor and the cup of water was knocked over.

g)    Video footage of the inside of cell J-15 shows Mr. Woodard on the ground at 12:39 p.m. At 12:42 p.m., still on the ground, he moves his body towards the door. His head is against the door, facing up. He continues to move in place but

not in the same manner as before. Someone looks in the cell at approximately 12:50 p.m. and observes Mr. Woodard as he lay at the door for several minutes.

h)     At approximately 12:55 p.m., Nurse Barwick was called to cell J-15. She got to the cell and asked, "What do we got?" She was told that Mr. Woodard's lips looked white. Nurse Barwick couldn't get a good visual of Mr. Woodard because his head was too close to the door so she opened the door to his cell. She checked his vitals and noted no breathing activity, dry food on his lips, and that he was staring into space with his eyes fixed.

i)     Nurse Barwick asked for an AED at approximately 1:03 p.m. and started CPR. 911 was called. Multiple no shock advisories were given during the CPR process. Narcan was given. At 1:04 p.m., nurses arrived with oxygen and a jump bag. At approximately 1:10 p.m., the nursing supervisor entered the cell.

j)     Nurse Mossbarger responded to J-15 to help Nurse Barwick. She checked Mr. Woodard's medical history to see if he had any issues with blood sugar but did not see any history of it. She saw that Mr. Woodard did have a history of using drugs, according to their records.

k)     Houston County EMS arrived at approximately 1:13 p.m. and placed Mr. Woodard on a stretcher with automatic chest compressions in place. They left Houston County Detention Center at 1:15 p.m.

l)    EMS listed the primary symptom as cardiac arrest with a secondary impression of "endocrine-diabetes with hypoglycemia." At 1:14 p.m. EMS noted a blood glucose level to be "low." EMS administered naloxone at approximately 1:15 p.m. without improvement. At 1:15 p.m. IV Dextrose 50% solution was administered and Mr. Woodard's "response was improved." He was intubated at 1:17 p.m. and ROSC was obtained at 1:19 p.m.

m)    EMS arrived at the Houston Healthcare Warner Robbins Emergency Department at approximately 1:45 p.m. A 16 FR Foley was put in place with no urine output obtained. Mr. Woodard was hooked up to a 12-lead cardiac monitor and lifepak. Multiple wounds were noted. His initial vitals were: Temperature 98.4F, HR 102, BP 104/83, RR 32, and O2 SAT 100% on the ventilator, and a POC glucose of 133 mg/dL. His labs were notable for a CK of >7,800 U/L, POC potassium of 7.8 and a POC creatinine of 4.9, and ECG with widened QRS and peaked T-waves.

n)    At approximately 2:26 p.m. Mr. Woodard was receiving IV fluids when his eyes dilated and he went into cardiac arrest. ACLS protocol started, treated with epinephrine, calcium chloride, sodium bicarbonate, and Mr. Woodard briefly gained a faint pulse about 10 minutes into CPR for 15 seconds. He did not regain a pulse after that. He was pronounced deceased at 2:54 p.m.

o)    An autopsy was performed by the GBI, Division of Forensic Sciences, Office of the Medical Examiner, on October 4, 2024. The cause of death was

determined to be "toxic effects of methamphetamine." A toxicology report found that Mr. Woodard was positive for methamphetamine 3.8 mg/L.

## OPINIONS

15.

It is my opinion that the medical care provided by the medical professionals at the Houston County Detention Center to David Woodard on October 1, 2024, fell below the standard of care required of nurses practicing under the same or similar circumstances.

16.

In particular, the care provided to David Woodard fell below the standard of care in at least the following respects:

(a) The medical staff at the detention center should have recognized that Mr. Woodard was exhibiting clear signs of a sympathomimetic drug overdose. Nurse Barwick and other medical providers fell below the standard of care by failing to identify the signs and symptoms consistent with sympathomimetic toxicity and by failing to send Mr. Woodard to the hospital for further medical evaluation. The inability to obtain vital signs due to agitation should itself have prompted escalation of care and transfer to a hospital. Vital signs are essential for triage and for assessing

clinical instability. Even in the absence of documented vital signs, Mr. Woodard appeared grossly unstable based on video evidence demonstrating severe psychomotor agitation and psychotic behavior. In a hospital setting, emergency department providers would have stabilized Mr. Woodard, including the use of sedation if necessary, in order to obtain vital signs and laboratory testing, including a glucose level, and to treat the underlying sympathomimetic toxicity.

(b) Instead of receiving appropriate medical evaluation and care, Mr. Woodard was left in cell J-15 for more than four hours without adequate medical assessment or treatment. The failure to properly evaluate Mr. Woodard for this prolonged period and the failure to transfer him to an emergency department represent a deviation from the standard of care. The care provided by Nurse Barwick and other medical providers at the Houston County Detention Center demonstrated a lack of appropriate awareness and urgency regarding Mr. Woodard's critical medical condition.

(c) Nurse Barwick and other medical staff at the Houston County Detention Center also fell below the standard of care by failing to contact a physician, registered nurse, or other senior medical provider when difficulties arose during the intake process. If Nurse Barwick was unable to obtain vital signs, the standard of care required escalation of care and consultation with a more senior medical provider for assistance and further evaluation.

17.

Had these deviations from the applicable standard of care not occurred, David Woodard would have received appropriate medical evaluation and treatment. Instead, he suffered a cardiac arrest due to severe hypoglycemia and hyperkalemia. Prolonged agitation from methamphetamine intoxication can lead to profound metabolic stress with markedly increased energy expenditure. Under such conditions, patients may develop critical hypoglycemia due to excessive glucose utilization. Additionally, sustained agitation can lead to muscle breakdown (rhabdomyolysis), which may result in kidney injury and elevated potassium levels (hyperkalemia), a condition that can precipitate life-threatening cardiac arrhythmias.

18.

If David Woodard had been transferred to a hospital earlier, medical providers would have recognized and treated these conditions. Hypoglycemia is readily identifiable and treatable with prompt glucose administration. Similarly, hyperkalemia and the complications of rhabdomyolysis can be rapidly identified and managed in a hospital setting. Because Mr. Woodard remained untreated for several hours despite clear signs of medical instability, the opportunity to diagnose and treat these reversible conditions was missed.

19.

It is therefore my opinion that, had David Woodard received timely medical evaluation and treatment, his cardiac arrest and subsequent death would more likely than not have been prevented.

20.

The opinions expressed in this Affidavit are my opinions at this time and are based on the information I have been given. I reserve the right to change or modify my opinions, or to develop additional opinions, if further information is received during the case.

**FURTHER AFFIANT SAYETH NOT**

Jonathan de Olano, M.D., M.A.T.

Sworn to and subscribed before me this _____ day of March, 2026

Notary Public
My Commission Expires: Jan 3, 2027

VANESSA WILLIAMS
Notary Public - State of Georgia
Cobb County
My Commission Expires Jan 3, 2027